UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HERBERT W. HACKNEY | : | |
| | : | |
| v. | : | C.A. No. 07-253A |
| | : | |
| MICHAEL J. ASTRUE, Commissioner | : | |
| Social Security Administration | : | |

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on July 2, 2007 seeking to reverse the decision of the Commissioner. On January 7, 2008, Plaintiff filed a Motion to Reverse the Decision of the Commissioner. (Document No. 5). On February 7, 2008, the Commissioner filed a Motion for Order Affirming the Decision of the Commissioner. (Document No. 6).

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for Order Affirming the Decision of the Commission (Document No. 6) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 5) be DENIED.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for SSDI and SSI on January 13, 2005, alleging disability as of April 1, 2002. (Tr. 43-47).[1] The applications were denied initially (Tr. 31-33) and on reconsideration. (Tr. 35-37). Plaintiff filed a request for an administrative hearing. (Tr. 39). On November 9, 2006, a hearing was held before Administrative Law Judge Martha Bower (the "ALJ") at which Plaintiff, represented by counsel and a vocational expert appeared and testified. (Tr. 294-324).

On December 27, 2006, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 13-20). Plaintiff appealed to the Appeals Council by filing a request for review. (Tr. 9). The Appeals Council denied Plaintiff's request for review on April 27, 2007. (Tr. 5-7). A timely appeal was then filed with this Court.

## II. THE PARTIES' POSITIONS

Plaintiff argues that the ALJ's physical and mental residual functional capacity ("RFC") findings are not supported by substantial evidence.

The Commissioner disputes Plaintiff's claims and asserts that there is substantial evidence in the record that supports the ALJ's credibility determination and RFC assessment.

## III. THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence

---

[1] The SSI application and SSI denials are not in the administrative record but a "Disability Transmittal" form notes that an SSI application was filed on January 3, 2005 and transmitted on January 13, 2005. (Tr. 291). In addition, the ALJ noted that an SSI application was filed. (Tr. 13).

as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276 F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980)

(remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. With a sentence six remand, the parties must return to the court after remand to file modified

findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV. DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A. Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a

treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

**B. Developing the Record**

The ALJ has a duty to fully and fairly develop the record. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained. See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). The obligation to fully and fairly develop the record exists

if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

**C. Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

**D. The Five-step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth,

if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

**E. Other Work**

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a

claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

**1. Pain**

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42

U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4) Treatment, other than medication, for relief of pain;
>
> (5) Functional restrictions; and
>
> (6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

**2. Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires

that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V. APPLICATION AND ANALYSIS

Plaintiff was forty-four years old at the time of the ALJ hearing and has a high school education with previous work experience as a laborer and optical technician. (Tr. 43, 78, 82). Plaintiff alleged disability due to depression, anxiety, asthma and low back and knee pain. (Tr. 15, 77, 299).

Plaintiff reported that he had been in jail six or seven times for a total of eighteen years with his most recent incarceration having been for twenty-one months ending in December 2004. (Tr. 300-301).[2] Plaintiff acknowledged a history of drug use, including the use of marijuana a few days before his hearing. (Tr. 302, 307). He reported that he sometimes had purchased the marijuana but that on other occasions it would just be shared with him by friends. (Tr. 307-308). He testified that he had also used cocaine and heroin but that he had not used cocaine since about 1999 and had not used heroin in a few months. (Tr. 308). When asked about an April 2006 toxicology report that

---

[2] Coincidentally, Plaintiff appeared in Superior Court on the day following the ALJ hearing and plead nolo contendere to a felony drug possession charge. See State v. Hackney, P2-2006-3760A. Plaintiff was sentenced to six years (three months to serve and sixty-nine months suspended) by Justice Lamphear on November 10, 2006.

showed cocaine in his system, Plaintiff said that this was not from using cocaine but rather from cooking it for others for money. (Tr. 308-309). Contrary to his testimony, Plaintiff's medical records document use of cocaine in February 2003 (Tr. 163) and as recently as August 2006. (Tr. 264).

On October 10, 2002, Plaintiff complained of having had lower back pain radiating into his left leg for about two weeks. (Tr. 126). The next day, he was seen by Dr. Hirsch, an orthopedist. (Tr. 145). X-rays showed a pellet in the area of Plaintiff's left hip from an injury as a child, but Dr. Hirsch did not believe that this contributed to his discomfort. Id. Dr. Hirsch felt that the evaluation was strongly suggestive of lumbar radiculitis. Id.

Plaintiff testified that he has had asthma all of his life, (Tr. 316), and uses an inhaler for his asthma. (Tr. 163). Plaintiff was seen at Roger Williams Medical Center ("RWMC") on February 18, 2003 for complaints of shortness of breath. (Tr. 163). It was noted that he has "a history of asthma since childhood who has a well established asthma exacerbation secondary to cocaine." Id. It was reported that Plaintiff had begun to experience shortness of breath two days earlier after snorting cocaine. Id. Chest x-rays showed that his lungs were normal, well-expanded and clear. (Tr. 162).

On February 25, 2003, Plaintiff saw Dr. Kumi for wheezing and coughing with some shortness of breath. (Tr. 125). Dr. Kumi felt that he was suffering from asthmatic bronchitis or exacerbation of his asthma. Id. Plaintiff was admitted to Miriam Hospital on February 26, 2003, with a complaint of shortness of breath. (Tr. 173-174, 204-205). It was felt that he had possible sinusitis and he was placed on antibiotics. (Tr. 174, 181). Chest x-rays and a chest CT scan showed infiltration of the upper and lower lobes of the right lung with a possible left lower lobe cavitary

lesion. (Tr. 195, 204, 214). On March 3, 2003, Plaintiff's condition, which was diagnosed as pneumonia and lung abscesses, was described as improved, but he left the hospital against medical advice. (Tr. 205).

On March 11, 2003, Plaintiff told Dr. Kumi that he had left Miriam Hospital because he did not want any further tests performed and that he had felt well since returning home with no shortness of breath. (Tr. 125). He also reported using his inhaler less frequently. Id. Plaintiff stated that he "has not felt this well for a long time." Id.

On April 10, 2003, Dr. Kumi reported that Plaintiff was doing much better and that x-rays showed improvement in the lung infiltrate. (Tr. 122, 140, 142). Dr. Kumi noted that an examination of his lungs revealed minimal wheezing with no rales. (Tr. 122).

On April 17, 2003, Plaintiff went to RWMC, reporting that he had been snorting heroin about a week earlier and had started wheezing and developed difficulty breathing. (Tr. 164). Chest x-rays showed Plaintiff's lungs were well-expanded and clear and did not show any infiltrates. (Tr. 159, 160).

While in prison, Plaintiff complained of back pain in June and July 2003. (Tr. 108). An MRI performed on September 3, 2003 showed a left lateral disc bulge at the L5-S1 level that impinged on the L5 nerve. (Tr. 113, 256). On October 3, 2003, physical therapy was prescribed, and by October 17, 2003, Plaintiff reported improvement in his pain. (Tr. 102, 106). In November, Plaintiff reported an acute worsening of his pain. (Tr. 101). On January 22, 2004, Plaintiff's lower back symptoms were reported to be improved, and Vicodin was discontinued. (Tr. 100). In April 2004, it was noted that Plaintiff's back pain had initially been severe but had "significantly improved." (Tr. 113). His medical records do not show further back pain complaints until August

2004 when Vicodin was prescribed for ten days. (Tr. 88, 95). Plaintiff's medical records do not show any further prescriptions for Vicodin or ongoing complaints of significant back pain requiring any treatment thereafter. (Tr. 88-90).

While incarcerated in July 2004, Plaintiff was referred for psychiatric review for complaints of mixed feelings of anger, depression and confusion. (Tr. 91). At that time, Plaintiff, who was scheduled for release in December, was in segregation for fighting. Id. The record does not show that any medication or treatment for any psychiatric condition was prescribed.

In December 2004, a few weeks before his release from jail, Plaintiff reported fluctuating moods. Id. It was noted that Plaintiff did not have a history of a mood disorder or other psychiatric diagnosis. Id. Plaintiff said, "I think I'm scared. I've been in and out of here [jail] all my life." Id. Plaintiff was anxious, depressed and tearful about his pending release. Id.

In April 2005, Plaintiff's attorney sent him to a psychologist, Lucille Frieder, Ph.D., for cognitive and emotional screening to determine his competence for work. (Tr. 222-227). Plaintiff told Dr. Frieder that he was troubled and reported that he had not gotten along with people in his last job as a laborer in 2000.[3] (Tr. 222).

Dr. Frieder noted that during the evaluation, Plaintiff's affect was negative, his manner was guarded, his mood was depressed, and he was tense and anxious; but, his autobiographical memory was within normal limits as were his attention, concentration and motivation. (Tr. 223). His thought process was logical and coherent. Id. Plaintiff indicated that he had graduated from high school with grades that were "above average for a boy." Id. The results of Plaintiff's mini-mental status examination (correctly answering 28 of 30 questions) were within normal range for a high school

[3] Although he may have done some temporary work after 2000, Plaintiff's last sustained employment, and his only employment in 2000, was as an optical technician. (Tr. 51).

graduate of his age. (Tr. 224). IQ testing indicated a verbal IQ of 70, performance IQ of 81 and a full scale IQ of 74. Id. Dr. Frieder opined that "[y]ears of drug abuse and reduced stimulation may have served to lower the patient's IQ to a certain extent." Id.

Plaintiff performed fairly well with respect to immediate auditory verbal memory but poorly with respect to delayed auditory verbal memory after a period of thirty minutes. (Tr. 224-225). On the other hand, Plaintiff's delayed visual memory of a complex figure was quite strong. (Tr. 225). He performed perfectly with respect to visual motor integration. Id.

Plaintiff endorsed symptoms of extreme depression. (Tr. 225-226). He reported that he did no activities in his household, had no friends, did not see anybody but his family and had given up hobbies he had in the past. (Tr. 226). He described his task persistence as fair to poor and his concentration as erratic.[4] Id.

About two weeks after she had evaluated Plaintiff, Dr. Frieder prepared a questionnaire regarding his mental RFC. (Tr. 228-229). She opined that Plaintiff had a severe constriction of interest, a moderately severe impairment in his ability to relate to others, and a moderate restriction in daily activities such as doing work around the house and socializing with friends and neighbors. (Tr. 228). She opined that Plaintiff had a moderately severe to severe limitation in his ability to remember instructions and moderately severe limitations in his ability to respond to customary work pressure or to respond appropriately to co-workers or supervisors. Id. Dr. Frieder also opined that Plaintiff's ability to perform complex tasks or varied tasks was moderately severely limited but that his ability to perform simple tasks or repetitive tasks was only moderately limited. (Tr. 229).

[4] Plaintiff incorrectly suggests that Dr. Frieder concluded that Plaintiff had erratic concentration and only fair to poor task persistence. (Document No. 5 at 9). In fact, these terms appear in Plaintiff's report of activities, interests and relationships (RAIR-R) (Tr. 226) and Dr. Frieder had reported that his attention and concentration appeared to be within normal limits. (Tr. 223).

On April 29, 2005, Michael Slavit, Ph.D., reviewed Plaintiff's records including Dr. Frieder's evaluation and prepared a psychiatric review technique form ("PRTF") and a mental RFC assessment of Plaintiff. (Tr. 230-246). Dr. Slavit concluded that Plaintiff had borderline intellectual functioning and an affective disorder. (Tr. 230, 231, 233). Dr. Slavit also concluded that Plaintiff's condition resulted in only a mild restriction of activities of daily living and moderate difficulty maintaining social functioning, concentration, persistence and pace. (Tr. 240). Dr. Slavit indicated that Plaintiff's mental condition did not significantly limit his ability to understand, remember and carry out simple instructions; to work in coordination with others; to get along with co-workers or peers; or to maintain socially appropriate behavior. (Tr. 244-245). Dr. Slavit reported that Plaintiff would have a moderate limitation in maintaining attention and concentration for extended periods; in interacting with the general public; and in accepting instructions and responding to criticism from supervisors. Id. Dr. Slavit concluded that Plaintiff's memory was adequate for repetitive two- or three-step tasks, although instructions for three-step tasks might need to be repeated. (Tr. 246). Dr. Slavit also concluded that he retained the ability to perform work in an eight-hour day with normal breaks after every two hours. Id. In August 2005, Mary Ann Paxson, Ph.D., reviewed Plaintiff's records and agreed with Dr. Slavit's assessment. (Tr. 252).

On May 13, 2005, Plaintiff told Dr. Sadovnikoff that he had lifelong asthma. (Tr. 248). On examination, Dr. Sadovnikoff noted that Plaintiff's lungs were clear with some noisy breathing noted only at the end of the examination. Id. Dr. Sadovnikoff noted that Plaintiff had moderately persistent asthma by history but that spirometry suggested only a mild restriction with one-second forced expiratory volume ("FEV") actually being more than 100% of predicted. (Tr. 249). Dr.

Sadovnikoff reported that all of his examination results indicated that Plaintiff's asthma was less severe than indicated in his history or was "under quite good control." Id.

In May 2005, Dr. Hanna reviewed Plaintiff's medical records (Tr. 31) and found that Plaintiff's asthma was "not severe." (Tr. 253-254). In addition, Dr. Hanna did not indicate that Plaintiff had any exertional limitations as a result of his back pain. (Tr. 254). In September 2005, Dr. Bernardo reviewed Plaintiff's medical records and agreed that his asthma was "not severe." (Tr. 250).

On April 19, 2006, Plaintiff went to RWMC with complaints of an asthmatic attack having started the night before. (Tr. 257). Plaintiff was wheezing severely, and toxicology tests were positive for cocaine, THC and opiates. Id. Plaintiff was given a combivent inhaler and a steroid, and his asthmatic attack improved. Id.

On July 10, 2006, Plaintiff returned to the RWMC Emergency Room with complaints of a productive cough, chest pain, shortness of breath and wheezing. (Tr. 258). Plaintiff reported that he smoked less than a pack of cigarettes per day and smoked THC daily. Id. There was good air entry into his lungs with expiratory wheezes throughout the lung field. Id. Chest x-rays did not show any acute pulmonary disease, and Plaintiff's lungs were clear before he went home. Id. Asthma exacerbation and bronchitis were diagnosed. Id.

On August 7, 2006, Plaintiff went to the RWMC Emergency Room complaining of a productive cough and a several-day exacerbation of his asthma. (Tr. 259). In July, Plaintiff was reportedly smoking less than a pack of cigarettes per day. (Tr. 258). He now reported that he was still smoking but was trying to cut down and that he had run out of his inhaler. (Tr. 259). Plaintiff was diagnosed with asthmatic bronchitis and was discharged that same day in stable condition.

On August 28, 2006, several days after striking his wife, Plaintiff went to the RWMC Emergency Room complaining of suicidal ideation without specific plan and difficulty controlling his thoughts. (Tr. 260). Plaintiff denied any recent opiate use, but urine analysis was positive for cocaine and marijuana. Id. His psychiatric profile was described as "somewhat anxious and depressed," and his affect was described as flat. Id. He was diagnosed with depression, and his condition was indicated as stable. Plaintiff was held at RWMC overnight and transferred to the Providence Center the next day. (Tr. 260, 264). Plaintiff reported that he would steal, rob or "do whatever" to obtain money. (Tr. 264). Plaintiff was diagnosed with anti-social personality disorder and impulse control disorder. The diagnosis also noted the need to rule out polysubstance abuse disorder in light of Plaintiff's history of cocaine, heroin and marijuana use. Id. Initially, Doreen Emond, a Registered Nurse, rated Plaintiff's global assessment of functioning ("GAF") at 40; but, later that day, she rated it as somewhat improved at 45. (Tr. 265, 268).

On September 8, 2006, Plaintiff was seen at RWMC for an asthma exacerbation. (Tr. 261). Plaintiff reported that he had a recent upper respiratory infection and had run out of his asthma inhaler. Id.

The ALJ decided this case adverse to Plaintiff at Step 4. The ALJ concluded that Plaintiff had the "severe" (20 C.F.R. §§ 404.1520(c) and 416.920(c)) impairments of asthma, active substance abuse, cognitive disorder, impulse control disorder and antisocial personality disorder. The ALJ did not find Plaintiff's back problems to be a "severe" impairment. As to RFC, the ALJ determined that Plaintiff was physically able to perform work at all exertional levels subject to certain nonexertional restrictions related to Plaintiff's asthma and mental disorders. In particular, Plaintiff had to avoid exposure to pulmonary irritants and was limited to work consisting of simple

one-, two- and three-step tasks (with appropriate breaks every two hours) and an object or material-focused job involving minimal interaction with co-workers and the public. Based on this RFC and testimony from the vocational expert, the ALJ found that Plaintiff was capable of performing his past work as a batch mixer or as a laborer and rendered a no-disability finding.

### A. The ALJ's Physical and Mental RFC Findings are Supported by Substantial Evidence and Thus are Entitled to Deference.

Plaintiff's appeal is a generalized attack on the ALJ's RFC findings. Plaintiff contends that there is no medical evidence of record to support the ALJ's findings as to physical impairments, and that the ALJ erroneously gave greater weight to the opinions of the non-examining psychologists over the Plaintiff's retained, one-time examiner as to mental impairments. (Document No. 5 at 17).

First, Plaintiff has not challenged the ALJ's adverse credibility determination and, in any event, could not do so credibly, based on the evidence of record. The ALJ determined that Plaintiff's statements regarding the "intensity, persistence and limiting effects of [his alleged] symptoms are not entirely credible" (Tr. 18) and "cannot be taken at face value." (Tr. 19). The ALJ accurately notes that "at the hearing [Plaintiff] repeatedly made statements that were at odds with the medical record." Id. In particular, the ALJ identified contradictions regarding Plaintiff's cocaine usage and smoking. Id. The record also contains a report from The Providence Center in which Plaintiff reportedly stated that he would "steal, rob or do whatever if he needs money." (Tr. 264). This explains Plaintiff's criminal record and significant history of prison time. It also supports the ALJ's adverse credibility determination because someone who would "steal, rob or do whatever" for money would also presumably be willing to lie to an ALJ or doctor to obtain disability benefits.

The issue of credibility is particularly important in this case and must be factored into the ALJ's evaluation of the medical evidence. The assessment of Plaintiff's credibility is a "quintessential" question of fact for "the ALJ who hears the evidence first hand and is in a far better position to make such determinations than a reviewing Court presented with nothing more than a cold record." Suranie v. Sullivan, 787 F. Supp. 287, 291 (D.R.I. 1992).

For instance, as to the ALJ's mental RFC assessment, Plaintiff contends that the ALJ erred by failing to give sufficient weight to the opinion of Dr. Frieder. Dr. Frieder is a Psychologist who conducted a cognitive and emotional screening of Plaintiff on one occasion at the request of Plaintiff's counsel. See Ex. 7F. The ALJ found that Dr. Frieder's opinions were "due little probative weight" because they are either inconsistent with the medical evidence of record or based upon Plaintiff's self reports. (Tr. 19). Since these reasons are supported by the record, they are entitled to deference.

As noted above, the ALJ made a supported finding that Plaintiff lacked credibility and thus it was not error for the ALJ to discount medical opinions based on Plaintiff's self reports. Dr. Frieder opined that Plaintiff is "severely depressed." (Tr. 227). However, this conclusion was based on Plaintiff's subjective responses to the Beck Depression Inventory. (Tr. 225-226). Dr. Frieder also opined that Plaintiff was "borderline" mentally retarded based on his IQ test performance. (Tr. 224, 227). However, Dr. Frieder also noted that Plaintiff graduated "regular" high school on time and with grades "above average for a boy." (Tr. 223). She also noted that his attention and concentration were within "normal limits" and his thought "logical and coherent." Id. To account for this apparent inconsistency, Dr. Frieder speculates that "years of drug abuse and reduced stimulation" may have caused a reduction in Plaintiff's IQ. (Tr. 224). Yet, Plaintiff's record shows

that he was able to sustain employment for lengthy periods when not in prison, (Tr. 48-53), and the ALJ noted that Plaintiff was "quite able to attend and concentrate at hearing." (Tr. 19). Finally, Dr. Frieder's opinion that Plaintiff suffered from "mixed personality disorder with antisocial independent traits" (Tr. 227) appears to also be based primarily on Plaintiff's "report of activities, interests and relationships." (Tr. 226). In view of the ALJ's supported adverse credibility finding, it was not error for the ALJ to discount the weight given to Dr. Frieder's opinion and place more weight on the subsequent opinions of the non-examining consultants (Dr. Slavit and Dr. Paxson). (Tr. 230-246, 252). See Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (An ALJ "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors.").

As to the ALJ's physical RFC findings, Plaintiff contends that the ALJ's conclusions regarding his asthma and back pain are not supported by medical evidence. Plaintiff first argues that the ALJ reached contradictory conclusions regarding the severity of his asthma. (Document No. 5 at 11). In particular, Plaintiff contends that the ALJ's finding that his asthma was a "severe" impairment within the meaning of 20 C.F.R. § 404.1520(c) conflicts with her RFC finding that his asthma is "mild and controllable." (Tr. 15, 18). Plaintiff is incorrect, as these two findings are not mutually exclusive.

The evidence of record shows that Plaintiff has had asthma throughout most of his life. The record also shows that it is generally controlled with medication with exacerbations resulting when Plaintiff was using drugs. Additionally, Dr. Hanna and Dr. Bernardo found that Plaintiff's asthma was "not severe." (Tr. 250, 253-254). Pulmonary testing conducted by Dr. Sadovnikoff suggested only a mild restriction, and Plaintiff's one-second forced expiratory volume ("FEV") was more than

100% of predicted. (Tr. 249). Dr. Sadovnikoff reported that all of his examination results indicated that Plaintiff's asthma was less severe than indicated in his history and/or was "under quite good control." Id.

The ALJ found that because of his asthma, even though it was mild and generally controlled, Plaintiff should avoid concentrated exposure to pulmonary irritants. Because some jobs do require exposure to such irritants, the ALJ properly found Plaintiff's asthma was a "severe" impairment, i.e., one which significantly limits one's physical ability to perform basic work activities. See 20 C.F.R. § 404.1520(c). The ALJ also noted the apparent link in the record between Plaintiff's asthma attacks and his drug use (see e.g., Tr. 163) and the absence of asthma complaints while he was in prison and presumably not actively using drugs. (Tr. 18). The ALJ's finding that Plaintiff's asthma is "mild and controllable" is supported by substantial evidence and not inconsistent with her preliminary finding that it was a "severe" impairment as defined in 20 C.F.R. § 404.1520(c).

Plaintiff also contends that the ALJ erred in evaluating his back condition. Plaintiff notes that Dr. Sadovnikoff had not made any comment about functional limitations related to his back. (Document No. 5 at 13). However, this is because there is no record that Plaintiff ever expressed any back complaint when he was examined by Dr. Sadovnikoff. Plaintiff's chief complaint was asthma, and, on examination, Dr. Sadovnikoff noted that Plaintiff had normal curvature of the spine and that Plaintiff's range of motion was preserved. (Tr. 248).

The record as a whole supports the ALJ's finding that Plaintiff's back condition was not severe and did not present significant functional limitations. While Plaintiff was in prison, an MRI in September 2003 showed a disc bulge at the L5-S1 level that impinged on the L5 nerve. (Tr. 113, 256). After two weeks of physical therapy, Plaintiff reported improvement in his pain. (Tr. 102,

106). Plaintiff reported an acute worsening of his pain in November. (Tr. 101). By January 22, 2004, however, his lower back symptoms were reported to be improved, and Vicodin was discontinued. (Tr. 100). In April 2004, Plaintiff's back pain was reported as "significantly improved." (Tr. 113). His medical records do not show further back pain complaints until August 2004 when a ten-day supply of Vicodin was prescribed. (Tr. 88, 95, 98).

The record does not contain any ongoing complaints by Plaintiff to any physician or hospital of significant back pain after April 2004. Various forms completed by Plaintiff since January 2005 do not indicate that he needs to take any prescribed pain medication because of his back (Tr. 73, 82) or that his back condition caused any significant functional limitations. (Tr. 54-61). "[T]he ALJ is entitled to consider the consistency and inherent probability of the testimony [and] [w]here there are inconsistencies in the record, the ALJ may discount subjective complaints of pain." Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 194 n.1 (1st Cir. 1987) (citations omitted). The ALJ's conclusion that Plaintiff does not have a "severe" back impairment is supported by substantial evidence and entitled to deference.

**VI. CONCLUSION**

For the reasons stated above, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 6) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 5) be DENIED. Final judgment shall enter in favor of Defendant.

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
April 1, 2008